The BANK of EUREKA SPRINGS and John Cross *v.*
Floyd Carroll EVANS

02-623 109 S.W.3d 672

Supreme Court of Arkansas
Opinion delivered June 5, 2003

440

*Bassett Law Firm; Davis, Wright, Clark, Butt & Carithers*, by: *Curtis L. Nebben*, for appellants.

*Everett Law Firm*, by: *John C. Everett*; and *Mason Law Firm*, by: *G. Chadd Mason*, for appellee.

*Allen W. Bird II*, for *amicus curiae* Arkansas Bankers Association.

*John J. Gill, John J. Byrne, Michael F. Crotty*, and *Allen W. Bird II*, for *amicus curiae* American Bankers' Association.

*Robert Rowe* and *Quattlebaum, Grooms, Tull & Burrow*, by: *Leon Holmes*, for *amicus curiae* Independent Community Bankers of America.

*Quattlebaum, Grooms, Tull & Burrow*, by: *Leon Holmes*, for *amicus curiae* Arkansas Community Bankers Association.

*Candace Franks*, Deputy Bank Commissioner & Legal Counsel, for *amicus curiae* Arkansas State Bank Department.

*Kathleen V. Gunning*, Counsel, Federal Deposit Insurance Corporation, and *Earl Fletcher Jackson*, U.S. Attorney's Office, for *amicus curiae* Federal Deposit Insurance Corporation.

W H. "Dub" Arnold, Chief Justice. In this appeal, appellants The Bank of Eureka Springs and John Cross (referred to hereafter as the Bank) seek to reverse the decision of a Carroll County jury holding the Bank liable for the malicious prosecution of appellee Floyd Carroll Evans. Appellants argue that they are entitled to a dismissal, either because the circuit court erred in holding that their actions were not protected by the "safe harbor" provision of the Annunzio-Wylie Money Laundering Act, 31 U.S.C. § 5318(g)(3) (Supp. 1999) (Act), or, in the alternative, because the jury's verdict is not supported by substantial evidence. Finally, they urge that they are at least entitled to a new trial because the jury's damage award was excessive and unconstitutional. We hold that the Bank's behavior toward the appellee—which was continuous, malicious, and based on information that the appellant knew was false—is not protected by the Act's safe harbor provision. We also uphold the jury's verdict and damage award.

## I. Background

The facts, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the appellee, as this court's standard of review dictates, *see, e.g., State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999), are as follows.

Mr. Evans is a Carroll County resident engaged in the cattle and construction businesses. He was a long-time customer at the Bank of Eureka Springs who, at the time relevant to this case, carried several notes at the Bank. In 1994, Mr. Evans approached his loan officer at the Bank, Gary Kleck, and asked the Bank to loan him $460,000 so that he could purchase 1,120 acres of unde-

veloped land adjacent to his home. According to Mr. Evans's trial testimony, he informed Mr. Kleck that he intended to clear the land and run cattle on it. He told Mr. Kleck that the timber could be used as a repayment source, but that the land would have to be surveyed, fenced, and money invested in bulldozing the land before it would begin producing repayment funds.

Based on this information, Mr. Evans and Mr. Kleck prepared a loan worksheet. The worksheet stated that the source of repayment for the loan would be "[c]ut timber from property—$200,000-$250,000 estimated value" and "[p]ersonal income — construction & farm income $200M+ (sic) annually." The loan worksheet listed the 1,120 acres as collateral, as well as $90,000 equity in Mr. Evans's home.

On February 15, 1994, the Board of Directors of the Bank approved a $460,000 loan for Mr. Evans. The minutes of the meeting reflected the information specified in the loan worksheet, including that one source of repayment for the loan would be money made by harvesting timber on the land. Mr. Kleck testified at trial that he informed the board during his presentation of Mr. Carroll's loan that repayment would come from timber sales and construction income. On April 1, 1994, Mr. Evans executed a mortgage and promissory note in favor of the Bank. The mortgage contained a clause stating that "it is agreed that mortgagor may not cut the timber from any land encumbered hereby . . . ."

In 1994 and 1995, Mr. Evans put his plan for the land into action. He surveyed and fenced the land, and then began harvesting timber. Mr. Evans testified at trial that he tried to remove the timber himself but did not have the expertise to do so. He therefore contracted with Holt Sawmill to remove the timber for him. Mr. Evans seeded and bladed off the land that he cleared, and ran cattle on it. In all, Mr. Evans succeeded in turning 140 out of the 1,120 acres into cattle pasture.

Mr. Evans testified that he divided the proceeds from the timber between making payments on the loan and keeping the logging operation going. Mr. Evans's sister, Judy Worley, who was also Mr. Evans's bookkeeper, testified at trial that she deposited checks at the Bank into Mr. Evans's loan account. Timber

receipts and bank records from this time period entered into evidence at trial indicate that Mr. Evans applied $21,693.43 out of $160,721.71 in timber proceeds towards repaying his loan.

Mr. Evans's business ventures took a downward turn in 1995 and 1996. In early 1995 Mr. Evans became involved in the Cedar Bluff project, a real estate development in Huntsville, Arkansas. The bonding fell through on Cedar Bluff, the project failed, and Mr. Evans, who was the chairman of the Cedar Bluff subdivision, suffered financially. In addition, the cattle market began to fall in June of 1995. Mr. Evans attempted to restructure his various projects, but in December 1996, he defaulted on the promissory note and mortgage. Mr. Evans began to think about filing for bankruptcy protection.

The Bank was not at all happy about the prospect of Mr. Evans filing for bankruptcy. When Mr. Evans informed appellant Mr. Cross, the president and CEO of the Bank, about his plans, Mr. Cross warned him that he would "make his life hell" if he filed for bankruptcy. In December, 1996, Mr. Cross questioned Mr. Evans's brother Troy (who was in the Bank on unrelated business) about a missing boat, motor and bulldozer, which were held as collateral on another of Mr. Evans's notes. Mr. Cross then told Troy that "[y]ou need to tell Carroll to get in there and play ball with me or I'm going to have you guys arrested." Mr. Evans filed for bankruptcy on June 11, 1997, and Mr. Cross eventually made good on his threat.

During the first meeting of creditors on August 21, 1997, Charles Cross—Executive Vice President of the Bank, and appellant's son—questioned Mr. Evans about the bulldozer, boat, and motor, which were not in Mr. Evans's possession. Mr. Evans stated that Mr. Kleck had released these items, and that they had been sold. Internal loan documents held by the Bank at that time indicated that the bulldozer had indeed been released by the Bank because it had been destroyed in a fire and the Bank had been paid the insurance proceeds. Testimony at trial indicated that Mr. Evans had never sold the boat but instead, had loaned it to a man named Jeff Birchfield. Nevertheless, Wade Williams, the Bank's attorney, filed a Suspicious Activity Report ("SAR") with federal

authorities. The SAR alleged that Mr. Evans had wrongfully disposed of collateral on notes held by the Bank. Mr. Williams also contacted Deputy Prosecutor Kenny Elser and filed a criminal complaint against Mr. Evans.

The Bank followed up the first SAR with a second on May 4, 1998, alleging that Mr. Evans had cut timber on the 1,120 acres without permission from the Bank. The Bank stated on the SAR form that "Mr. Evans cut and sold the timber off of this mortgaged property without obtaining a Timber Deed or stating his intentions to the bank prior to the cutting of said timber." The Bank also averred that "our bank never received any payments on the indebtedness here at the bank."

Mr. Cross and his son then met with Deputy Prosecutor Kenny Elser and Carroll County Sheriff's Office Investigator Leighton Ballard and filed a second criminal complaint against Mr. Evans. They again alleged that Mr. Evans had wrongfully disposed of a bulldozer, boat, and motor, that they had never given permission to Mr. Evans to harvest timber off of the land, and that Mr. Evans had never made any payments on his loan. Mr. Ballard wrote an affidavit of reasonable cause, which rested on the Bank's allegations. A bench warrant was issued for Mr. Evans's arrest. Mr. Evans subsequently surrendered himself to custody and was arrested. He was charged with three counts of defrauding a secured creditor, a class D felony punishable by up to six years' imprisonment. See Ark. Code Ann. §§ 5-37-203(b); 5-4-401(a)(5) (Supp. 2001). News of his arrest made the local papers.

During the course of the investigation, the prosecutor learned that some of the proceeds from the timber harvesting had, in fact, been applied to the loan. The prosecutor filed an amended affidavit, but did not dismiss the charges. During the run up to trial, Mr. Evans unsuccessfully sought protection from the U.S. Bankruptcy court by alleging that his arrest and criminal prosecution violated U.S. bankruptcy law. The criminal prosecution proceeded.

Before trial, Mr. Cross called a friend who worked in the governor's office and asked him to check and see if the prosecutor, Brad Butler, had received his phone messages regarding the case.

Mr. Cross received a call from Mr. Butler shortly thereafter. Also before trial, on June 1, 1999, Mr. Cross sent a letter to the prosecuting attorney stating that the Bank would be willing to settle the case in exchange for a sum of money and a land exchange. In the letter, Mr. Cross urged the prosecutor to impress on Mr. Evans's lawyer how beneficial the settlement offer was, "not having to wonder what a jury might do to his client."

Mr. Evans was never convicted. The circuit court granted Mr. Evans's motion to dismiss based on the statute of limitations. The circuit court's order dismissing the charges stated that "it is clear from the testimony adduced at the hearing of this matter that the Bank of Eureka Springs was aware at all the times complained of herein that the Defendant was going to and, in fact did, remove timber from his property and that said removal of timber was contemplated and known to the Bank of Eureka Springs . . . prior to the Defendant obtaining a loan from that particular institution" and that "there is no evidence that the Defendant engaged in the removal of timber from secured property without the knowledge or consent of the Bank of Eureka Springs." Mr. Evans subsequently filed suit against the Bank and Mr. Cross for, among other things, malicious prosecution.

At trial, several witnesses testified regarding the Banks's animosity toward Mr. Evans. Perry Johnson, a cattle rancher who lived on the land south of the 1,120 acres, testified that in the course of a meeting with Mr. Cross about renting pasture land for his cattle, Mr. Cross began complaining about Mr. Evans. Mr. Johnson replied that he was friends with Mr. Evans, and that he had come to the Bank to rent pasture, not talk about Mr. Evans. Mr. Cross replied: "Well, he's a crook and I'm going to put him in the big house."

Charles G. Fargo testified that a few months prior to trial, he had been at the West Oaks Restaurant when he was approached by Dave Bird, a member of the Bank's board of directors. Mr. Bird informed Mr. Fargo that the "motto down at the bank is to f*** Carroll Evans" and that he "could not believe that the Bank of Eureka Springs had loaned so much money to Lee Evans's son,

Carroll Evans." At the time, Mr. Fargo was sitting with Mr. Evans, Troy Evans, and Mr. Evans's nephew.

Mr. Evans testified that he had incurred great expense as a result of the prosecution and his efforts to clear his name. He specifically testified that he had lost $14,000 and owed an additional $20,000 because of the prosecution. He also testified that his equipment had been sold at auction, and that he no longer had a contractor's license. He testified that because of the prosecution, "I'm not the same person I used to be." He testified that he had been in places where people would walk away from him instead of shaking his hand, that he had overheard people in restaurants talking about him, and that he had heard people speak against him in public three or four times during the course of the prosecution. He testified that he had been reduced to tears over the situation and that he felt unable to leave his house for long periods of time. Several other witnesses testified about the effect that the prosecution had on Mr. Evans. Troy Evans testified that the charges had had a great impact on his brother, and that he had seen him cry over the charges. His daughter described the ordeal as "humiliating" for Mr. Evans, and his son described his father crying over the prosecution.

The jury found for Mr. Evans and awarded him $100,000 in compensatory and $300,000 in punitive damages. At all appropriate times, the Bank made motions for directed verdict, which were denied. With these facts in mind, we turn to the appellant's arguments.

## II. Discussion

### a. Safe Harbor

The appellants rely on the "safe harbor" provision of the Annunzio-Wylie Money Laundering Act, 31 U.S.C. § 5318(g)(3) (Supp. 1999), for the proposition that they are absolutely immune from charges of malicious prosecution based on their conduct. Their argument is that the safe harbor not only protects them from liability for filing the SAR reports with the federal government, but also extends to their efforts to ensure criminal conviction of Mr. Evans in state court. They argue that their motives for doing

so are irrelevant because the safe harbor shields financial institutions and their employees and agents for reporting suspicious activity or possible violations of law. Mr. Evans answers the argument by arguing that it was not the intent of Congress to shield behavior that is malicious, continuous, and based upon information known to be false at the time of the filing of the reports and the pursuit of state remedies.

 Our standard of review on this question is *de novo*, as it is for this court to decide what a statute means. *E.g., Brewer v. Fergus*, 348 Ark. 577, 79 S.W.3d 831 (2002). The cardinal rule of statutory construction is to effectuate the legislative will. *E.g., Ozark Gas Pipeline v. Arkansas Pub. Serv. Comm'n*, 342 Ark. 591, 29 S.W.3d 730 (2000). "We read the laws as they are written, and interpret them in accordance with established principles of statutory and constitutional construction, including application of the Supremacy Clause of the United States." *Hodges v. Huckabee*, 338 Ark. 454, 458-458, 995 S.W.2d 341, 345 (1999). We are not bound by the decision of the trial court, but unless it is shown that the circuit court's interpretation was wrong, we will accept its interpretation on appeal. *Id.* (citing *Bryant v. Weiss*, 335 Ark. 534, 983 S.W.2d 902 (1998)). We further explained our approach to statutory interpretation in *Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001), where we said:

> Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. We construe the statute so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible. . . . When a statute is ambiguous, we must interpret it according to the legislative intent. Our review becomes an examination of the whole act. We reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. We also look to the legislative history, the language, and the subject matter involved.

*Barclay*, 344 Ark. at 718, 42 S.W.3d at 500 (citations omitted). We have also said that literal meaning yields to legislative intent if

the literal meaning leads to absurd consequences contrary to legis-
lative intent. *E.g.*, *Burford Distributing, Inc. v. Starr*, 341 Ark. 914,
20 S.W.3d 363 (2000). Therefore, the first step is to examine the
language of the Act. It reads, in pertinent part:

> (g) Reporting of suspicious transactions.—
>
> (1) In General.—The Secretary may require any financial
> institution, and any director, officer, employee, or agent of any
> financial institution, to report any suspicious transaction relevant
> to a possible violation of law or regulation.
>
> \* \* \*
>
> (3) Liability for disclosures.—
>
> (A) In general.—*Any* financial institution that makes a vol-
> untary disclosure of any possible violation of law or regulation to
> a government agency or makes a disclosure pursuant to this sub-
> section or any other authority, and any director, officer,
> employee, or agent of such institution who makes, or requires
> another to make any such disclosure, shall not be liable under law
> or regulation of the United States, any constitution, law, or regu-
> lation of any State or political subdivision of any State, or under
> any contract or other legally enforceable agreement (including
> any arbitration agreement), for such disclosure or for any failure
> to provide notice of such disclosure to the person who is subject
> of such disclosure or any other person identified in the disclosure.

31 U.S.C. § 5318(g)(1). We recognize that the Act specifies that
financial institutions are to report "any possible violation of law or
regulation."[1] *Id.* We also agree with the federal jurisdictions
which have determined that the Act is to be broadly interpreted.
We do not agree, however, that Congress intended the Act's safe
harbor to give banks such blanket immunity that even malicious,
willful criminal and civil violations of law are protected. Impor-

---

[1] We also note that banks are apparently forbidden to even release the fact that a
SAR has been filed, *see Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (1999) ("Financial
institutions are required by law to file SARs, but are prohibited from disclosing that either a
SAR has been filed or the information contained therein.") (citing 12 C.F.R. § 208.20(k)
(1998)). We express no opinion about the legality of the Bank's disclosure of the fact of its
SAR filings against Mr. Evans, as this point was not raised by the parties. We do note,
however, that such disclosure in violation of federal regulations can be viewed as further
evidence of the Bank's malicious intent.

tantly, the Act requires there to be a "possible" violation of law—"possible" being the operative word—before a financial institution can claim protection of the statute. Here, viewing the evidence in the light most favorable to Mr. Evans, there was no possible violation. Despite its statement on the SAR form that it had conducted "a detailed investigation into the matter," the Bank did not mention the loan worksheet or the minutes from the board meeting when the Bank approved the loan. These documents indicate that the Bank knew from the very start that Mr. Evans planned to cut timber on the property. Nor did the Bank indicate that some of the timber proceeds had been used to pay down the loan. The Bank did not inform the state prosecutor of these facts either; on the contrary, it claimed the exact opposite. The Bank also never informed the prosecutor that it had received insurance proceeds from the burned-up bulldozer it claimed had been wrongfully sold by Mr. Evans, nor did it inform the prosecutor that the boat and motor had been loaned, not sold, to Mr. Birchfield. Under these facts, we hold that the Bank did not file a report of a "possible violation" of the law but rather acted maliciously and willfully in an attempt to have Mr. Evans arrested and brought to trial on charges it knew to be false. The Act's safe harbor does not apply to this situation.

The First Circuit's decision in *Stoutt v. Banco Popular De Puerto Rico*, 158 F.3d 26 (2003), relied upon by the Bank, is not to the contrary. In that case, a financial institution filed a "report of apparent crime" report with the FBI and the U.S. Attorney in an abundance of caution. *See id.* at 30. Upon the discovery of new information that made it clear that no crime had occurred, the U.S. attorney dismissed the charges. *Id.* Here, unlike the Bank in *Stoutt*, which "whatever its internal beliefs . . . did by any objective test identify a 'possible violation,'", *id.*, the Bank of Eureka Springs engaged in a continuous course of conduct seeking the prosecution of Mr. Evans by misrepresenting material facts to the prosecutor. Nor did the *Stoutt* bank attempt to derive financial benefit from the criminal prosecution, as did the Bank of Eureka Springs when it attempted to settle the case. Quite simply, there was no objective identification of a possible violation in this case.

Amici suggest that the twin purposes of the Act are to encourage financial institutions to report any known or suspected criminal activity, and to safeguard the public's trust in financial institutions. As we have explained, however, appellee was engaged in behavior that the appellees knew was neither criminal nor suspicious at the time of the SAR reporting. We fail to see how approving of the behavior of the bank in this case advances either purpose of the Act.

 In sum, stretching the definition of "any possible violation" to fit the facts at bar would lead to an absurd result contrary to legislative intent. We do not believe that Congress intended the safe harbor to protect Bank employees or officers who pursue personal vendettas against delinquent borrowers. We hold that the safe harbor does not apply.

*b. Jury Verdict: Malicious Prosecution*

The Bank's second argument is that the trial court erred in denying its directed-verdict motions. The Bank, arguing from *Wal-Mart Stores, Inc. v. Binns*, 341 Ark. 157, 15 S.W.3d 320 (2000), urges that there was insufficient evidence of malice presented at trial, and also that there was insufficient evidence that the Bank proximately caused Mr. Evans's damages.

 We have recently explained the standard of review for a denial of a motion for directed verdict:

> A directed-verdict motion is a challenge to the sufficiency of the evidence, and when reviewing a denial of a motion for a directed verdict, this court determines whether the jury's verdict is supported by substantial evidence. *See, e.g., Pettus v. McDonald II*, 343 Ark. 507, 36 S.W.3d 745 (2001); *Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000); *State Auto Property Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *See State Auto Property Cas. Ins. Co. v. Swaim, supra; City of Little Rock v. Cameron*, 320 Ark. 444, 897 S.W.2d 562 (1995); *St. Paul Fire & Marine Ins. Co. v. Brady*, 319 Ark. 301, 891 S.W.2d 351 (1995).

When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered, and we give that evidence the highest probative value. *See State Auto Property Cas. Ins. Co. v. Swaim*, *supra*; *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997). A motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991). A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Wal-Mart Stores, Inc., v. Kelton*, *supra*; *Stalter v. Coca-Cola Bottling Co.*, 282 Ark. 443, 669 S.W.2d 460 (1984). Under those circumstances, a jury question is presented, and a directed verdict is inappropriate. *Wal-Mart Stores, Inc., v. Kelton*, *supra*; *Stalter v. Coca-Cola Bottling Co.*, supra. It is not this Court's province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *Wal-Mart Stores, Inc. v. Kelton*, *supra*; *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481 (2000).

*D.B. Griffin Warehouse, Inc. v. Sanders*, 349 Ark. 94, 104–105, 76 S.W.3d 254, 261 (2002). The elements of the tort of malicious prosecution are (1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages. *South Arkansas Petroleum Co. v. Scheisser*, 343 Ark. 492, 36 S.W.3d 317 (2001).

 Here, the evidence viewed in the light most favorable to the appellee reveals substantial evidence to support the jury's verdict. As outlined above, the evidence reveals an intentional, malicious pattern of behavior on the part of the Bank. The Bank failed to reveal that its information, in the form of the loan worksheet and board meeting minutes, indicated that the Bank knew of Mr. Evans's plant to harvest timber in order to pay his loan back. The Bank went to the prosecutor and informed him that no timber proceeds had been used to pay down the loan, but this infor-

mation turned out to be false. The Bank accused Mr. Evans of wrongfully selling a bulldozer, boat and motor when in fact none of those things had happened. The Bank misrepresented material facts to the prosecutor and never corrected them, in spite of having ample time and opportunity to do so. The Bank argues that it was the prosecutor's decision to pursue the case against Mr. Evans and that it was merely a passive party. We have answered a similar argument by holding that when the information given to the prosecutor "is known by the giver to be false, *an intelligent exercise of the officer's discretion becomes impossible,* and a prosecution based upon it is procured by the person giving the false information." *Scheisser,* 343 Ark. at 496, 36 S.W.3d at 319 (quoting Restatement (Second) of Torts § 653 cmt. g) (emphasis added by the *Scheisser* court). Here, the prosecutor was not supplied with accurate information and so the Bank's effort to shift responsibility to the prosecutor fails. We affirm the jury's verdict.

### c. Jury Award

The Bank's third argument on appeal is that the damages imposed by the jury were excessive under this court's case law, and that the punitive damage award was both excessive in light of our prior cases and unconstitutional under the United States Supreme Court case of *BMW of North America v. Gore,* 517 U.S. 559 (1996). We review these arguments in turn.

### i. Compensatory Damages

Regarding the review of a jury award of compensatory damages, we have said:

> When an award of damages is alleged on appeal to be excessive, we review the proof and all reasonable inferences most favorable to the appellee and determine whether the verdict is so great as to shock our conscience or demonstrate passion or prejudice on the part of the jury.

*Ellis v. Price,* 337 Ark. 542, 551, 990 S.W.2d 543, 548 (1999) (quoting *Builder's Transp. v. Wilson,* 323 Ark. 327, 914 S.W.2d 742 (1996)). "The standard of review in such a case is that appropriate for a new trial motion, i.e., whether there is substantial evidence to

support the verdict." *Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003) (citing *Johnson v. Gilliland*, 320 Ark. 1, 896 S.W.2d 856 (1995) (citing Ark. R. Civ. P. 59(a)(5) (holding that an error in the assessment of the amount of recovery is grounds for a new trial))). Under Arkansas law, a person is entitled to emotional distress, mental anguish, and consequential damages resulting from malicious prosecution. *E.g., Hollingsworth v. First Nat'l Bank & Trust Co.*, 311 Ark. 637, 846 S.W.2d 176 (1989).

 We are persuaded from our review of the facts that the amount of damages is not so great as to shock the conscience of the court. Mr. Evans testified at trial that he had lost $14,000 and owed an additional $20,000 because of the prosecution. He also testified that his construction equipment had been sold at auction, and that he no longer had a contractor's license. Mr. Evans testified that his life had been profoundly changed for the worse by the ordeal of prosecution. He testified that he had endured public slight and insult as a result of the prosecution, and that he had been reduced to tears by the stress of the litigation. His family members also testified extensively about the effect that the prosecution had upon him. We hold that the jury's award of $100,000 compensatory damages, in light of almost $40,000 of actual damages as well as mental anguish stemming from fear of imprisonment, embarrassment before the community, and destruction of his business reputation, is supported by substantial evidence and does not shock the conscience of the court.

### ii. Punitive Damages

 Finally, the Bank argues that the jury's assessment of punitive damages is unsupportable under Arkansas common law, and also that the damage award violates due process under *BMW of North America v. Gore, supra.* When reviewing a punitive damage award under Arkansas common law, "we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party." *Ellis*, 337 Ark. at 551, 990 S.W.2d at 548. Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Id.* We have also held that "where, in light of the

evidence, the jury could have concluded that appellants displayed a conscious indifference for appellee and that their acts were done with the deliberate intent to injure her, the amount of punitive damages did not shock our conscience." *Id.* When conducting our review of an award of punitive damages, we view the evidence in the light most favorable to the appellee. *E.g., Houston v. Knoedl,* 329 Ark. 91, 947 S.W.2d 745 (1997).

██ As we have pointed out above, the evidence, when viewed in the light most favorable to Mr. Evans, indicates that the Bank acted with malicious intent to have Mr. Evans arrested and convicted on criminal charges that it knew were false. The enormity of the wrong is great enough to support punitive damages, considering that Mr. Evans faced the possibility of three felony convictions, each having a possible sentence of up to six years, if he was convicted. That the charges were leveled by a prominent member of the community—the Bank of Eureka Springs—also supports the assessment of punitive damages. In sum, the evidence was such that the jury could have concluded that the acts done to Mr. Evans were pursued with conscious indifference to his fate and with the deliberate intent to injure him. Considering all of the circumstances, we cannot say that the punitive damage award shocks the conscience of this court.

██ ██ With respect to the United States Supreme Court's decision in *BMW v. Gore, supra,* we hold that the jury's verdict in this case does not offend federal due process. This court has recently noted that under *Gore,* "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Advocat, Inc. v. Sauer,* 353 Ark. 29, 111 S.W.3d 346 (2003) (quoting *Gore,* 517 U.S. at 568). *Gore* lays out three criteria for determining if an award is so "grossly excessive" as to violate federal due process: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized by statute or imposed in comparable cases. *Id.* (citing *Gore,* 517 U.S. at 572).

██ ██ In *Advocat*, we noted that in assessing the first factor, the record will not support a conclusion that the defendant acted in a reprehensible fashion if (1) the harm inflicted by the tortfeasor was purely economic, (2) there was no evidence of bad faith, (3) the defendant did not continue its wrongful behavior after it had been adjudged at least once to be unlawful, and (4) the record is bare of "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive," *Id.* (quoting *Gore*, 517 U.S. at 576-580). The harm in this case was not purely economic in nature; the jury assessed damages for mental anguish based on the testimony adduced at trial regarding the negative effect that the prosecution had on Mr. Evans's personality and relationships with others. As we have explained above, there is ample evidence in the record to indicate bad faith, deliberate false statements, and acts of affirmative misconduct on the part of the Bank. We conclude that the punitive damage award does not fail for lack of evidence of reprehensibility in the record.

██ ██ The second factor requires us to consider the ratio between the compensatory damage award and the punitive damage award. This analysis is not accomplished according to "a simple mathematical formula," but instead looks to see if the ratio of compensatory to punitive damages is "breathtaking." *Gore*, 517 U.S. at 582-583. That the three-to-one ratio in this case is not "breathtaking" in the constitutional sense is easily seen by considering the United States Supreme Court's guidance in *Gore*, that although a "punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into the area of constitutional impropriety.'" *Gore*, 517 U.S. at 581. We hold that the ratio of compensatory to punitive damages in this case is constitutionally sound.

██ The final criterion calls upon this Court to look to the penalties authorized by statute or assessed in similar cases. We dispose of this criteria by noting that we have upheld a damage award in a malicious prosecution case comparable to the award in this case. *See Scheisser, supra* (upholding a punitive damage award of $250,000 for malicious prosecution and abuse of process). The award of punitive damages in this case is not so unexpected or bizarre as to be unconstitutional. In sum, the jury's damage award

in this case is not at odds with this Court's precedents or with federal due process.

Affirmed.

THORNTON, J., dissents.

RAY THORNTON, Justice, dissenting. This appeal arises from a trial court's denial of a motion for judgment notwithstanding the verdict filed by appellants, Bank of Eureka Springs ("Bank") and John Cross ("president"), after a jury entered a verdict in favor of appellee, Floyd Carroll Evans, on his claim for malicious prosecution.

## I. Historical development of the case

On April 1, 1994, appellee sought to purchase 1,120 acres of unimproved property for the agricultural purpose of raising cattle. Appellee went to the Bank and met with his loan officer, Gary Kleck, to finance the purchase of the 1,120 acres. Mr. Kleck prepared a loan worksheet that stated that the purpose of the loan was to purchase 1,120 acres in Carroll County and that the source of the repayment would be to cut timber from the property at an estimated value of $200,000 to $250,000, personal income, and construction and farm income of $200,000 plus annually. Mr. Kleck presented the loan to the Bank's Board of Directors for consideration, and on February 15, 1994, the loan was approved at their meeting. In the minutes of the board's meeting, it was noted that the loan would be repaid through the use of timber proceeds. In order to secure approval of the April 1, 1994 loan, appellee executed a promissory note and mortgage. The mortgage included a clause that stated, "[I]t is agreed that mortgagor may not cut the timber from any land encumbered hereby. . . . [.]"[1]

---

[1] The majority states that "the Bank knew from the very start that Mr. Evans planned to cut timber on the property." That is true, but the majority does not address the requirement, secured by the written language of the mortgage, that the cutting of timber would be based upon the written consent of the Bank, thereby giving the Bank control over the application of the proceeds to reduce the indebtedness for which the timber was held as collateral. This was not done. Out of the $160,721.71 received by Mr. Evans for cut timber, only $21,693.43 was applied to the loan.

During 1994 and 1995, appellee began removing timber from the property through a contract with Holt Sawmill. Appellee deposited checks from Holt Sawmill directly into his account. In February or March of 1995, appellee became involved in a real estate project known as Cedar Bluff. In June 1995, the cattle market began to fall, and the bonding for Cedar Bluff did not come through as appellee anticipated. Because of this business failure, appellee's finances were depleted. In 1996, appellee defaulted on the promissory note and mortgage. The Bank foreclosed on the property, and a sale was conducted on May 23, 1997. On June 11, 1997, appellee filed for bankruptcy, listing the Bank as a creditor.

A first meeting of creditors was held in the bankruptcy case on August 21, 1997. Charles Cross, who handled the loan after Mr. Kleck, attended the first meeting of creditors on behalf of appellants and determined that a bulldozer and a boat, which were collateral on a previous note, were no longer in appellee's possession. According to appellee, these items were released by Mr. Kleck and were sold. There was no documentation to support this assertion. Once the Bank learned of the cut timber, Mr. Cross reviewed his loan file and determined that there was no written permission or notations granting appellee the authority to cut the timber. Mr. Cross contacted Mr. Kleck, who stated that no permission was given releasing the boat or the bulldozer or allowing the timber to be cut.

A suspicious activity report ("SAR") was filed on September 17, 1997, by the Bank's attorney, Wade Williams. Based upon the information provided prior to October 15, 1997, Mr. Williams contacted Kenny Elser, a deputy prosecutor, to file a criminal complaint alleging that appellee disposed of collateral on notes held in favor of appellants. A second suspicious activity report was faxed by the Bank on May 4, 1998.

On May 4, 1998, an affidavit of reasonable cause was filed, charging appellee with defrauding a secured creditor. A bench warrant was issued for appellee's arrest. On June 19, 1998, an amended affidavit was filed when the prosecutor's office learned that some payments had been made on the loan. Exhibits show

that of the $160,721.71 received by Mr. Evans for cut timber, only $21,693.43 was applied to the loan.[2]

Appellee sought relief from a U.S. Bankruptcy Court, alleging that appellant violated U.S. bankruptcy law and seeking an injunction of criminal prosecution. Following testimony by appellants and their agents at two hearings, the petition for relief was denied.

The criminal prosecution of appellee proceeded, but before trial, the trial court dismissed the case on the basis that the statute of limitations had run on the claim.

Following entry of the order of dismissal, appellee filed suit against appellants for the tort of malicious prosecution. Appellants filed an amended answer, denying the allegations in appellee's complaint and alleging affirmatively that they had complete immunity and that they relied on the advice of counsel, the prosecuting attorney. Appellants also filed a motion for summary judgment, which was denied, and the case proceeded to trial.

At trial, at the close of appellee's case-in-chief, appellants moved for a directed verdict, which the trial court denied. The jury returned a verdict in favor of appellee and awarded $100,000 in compensatory damages and $300,000 in punitive damages against appellants. On December 11, 2001, the judgment was entered. Appellants filed a motion for judgment notwithstanding the verdict and an alternative motion for new trial. The trial court denied these motions. Appellants filed a timely notice of appeal.

On appeal, appellants seek reversal of the trial court's order affirming the judgment and denying appellant's motion for judg-

---

[2] The majority holds that the disposal of mortgaged property—namely the bulldozer, boat, and timber—did not support the filing of two SARs. The majority states, "[T]here was no possible violation [of law]." I disagree. Here, the trial court at a hearing during the criminal proceedings indicated that the prosecuting attorney possessed information supporting his filing of an affidavit of probable cause. At the hearing held on June 28, 2000, Judge Chandler stated in his rulings from the bench, "That is not to say that the State did not have probable cause to bring these charges. They certainly did . . . [.]" Indeed, all that is required to trigger the immunity from tort liability against the Bank was suspicious activity reflected by the filing of an SAR. If probable cause existed, then clearly there were suspicious activities.

ment notwithstanding the verdict, or in the alternative, motion for new trial. I believe we should reverse and dismiss for the following reasons.

## II. Applicable principles of law relating to immunity from prosecution and required elements for action of malicious prosecution

The majority opinion effectively strikes from a federal statute its provisions granting immunity from prosecution when a financial institution reports suspicious activity to law enforcement agencies. The majority then brushes aside this court's own well-established precedents articulating five essential elements to support an action for malicious prosecution.

I do not believe that the majority opinion is consistent with the statutory interpretations already made by the federal judiciary, and I do not think we can substitute our interpretation of a federal statute for that announced by the great majority of federal courts interpreting that same statute.

Even if this court has that authority, until the United States Supreme Court settles the issue, I could not agree that we should ignore our own five-pronged requirements for maintaining an action for malicious prosecution. For reasons I will now express, I respectfully dissent.

## A. Immunity under 31 U.S.C. § 5318

In my view, appellants have full immunity from the suit for the tort of malicious prosecution under the safe-harbor provision of the Annunzio-Wylie Anti-Money Laundering Act ("Act"), codified at 31 U.S.C. § 5318 (1992). The Act, which was enacted by Congress in 1992, imposes a duty upon financial institutions to report suspicious transactions, and provides in pertinent part:

> (g) Reporting of suspicious transactions.—
> (1) In general.—The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.

31 U.S.C. § 5318(g)(1).

Financial institutions may report "any suspicious transaction relevant to a possible violation of law or regulation," *id.*, by way of a suspicious activity report ("SAR"). A bank files a SAR with the United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), and banks are "encouraged to file a copy of the suspicious activity report with state and local law enforcement agencies where appropriate." 12 C.F.R. § 353.3(c).

The Act further contains a safe-harbor provision, codified at 31 U.S.C. § 5318(g)(3), to protect a bank when it reports suspicious transactions. This safe-harbor provision provides:

> (3) Liability for disclosures.—
> (A) In general.—Any financial institution that makes a voluntary disclosure of *any possible violation of law or regulation* to a government agency or makes a disclosure pursuant to this subsection or any other authority, *and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State,* or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.
> (B) Rule of construction.—Subparagraph (A) shall not be construed as creating—
> (i) any inference that the term "person", as used in such subparagraph, may be construed more broadly than its ordinary usage so as to include any government or agency of government; or
> (ii) any immunity against, or otherwise affecting, any civil or criminal action brought by any government or agency of government to enforce any constitution, law, or regulation of such government or agency.

*Id.* (emphasis added).

The Eleventh Circuit recognized three types of safe harbors in *Lopez v. First Union National Bank of Florida*, 129 F.3d 1186 (11th Cir. 1997). They are: (1) disclosure of any possible violation of law or regulation, (2) a disclosure pursuant to the provisions of Section 5318, or (3) a disclosure pursuant to any other authority. *Id.* With regard to the first safe harbor, the circuit court wrote:

> [T]he text of that subdivision indicates Congress deliberately did not limit the safe harbor to disclosure of any specific type of transaction. For example, § 5318(g)(3) provides that a financial institution is entitled to immunity for a disclosure of "any possible violation of law." 31 U.S.C. § 5318(g)(3) (emphasis added). As we have recently had occasion to explain, when used in a statute, "the adjective 'any' is not ambiguous; it has a well-established meaning." *Merritt v. Dillard Paper Company*, 120 F.3d 1181, 1186 (11th Cir.1997). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Id.*, quoting *United States v. Gonzales*, 520 U.S. 1, —, 117 S. Ct. 1032, 1035, 137 L. Ed.2d 132 (1997) (citation and some quotation marks omitted).

*Lopez, supra; see also Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999) (stating that the Act broadly and unambiguously provides for immunity from any law except the federal constitution for any statement in a suspicious activity report).

In *Coronado v. Bankatlantic Bancorp, Inc.*, 222 F.3d 1315 (11th Cir. 2000), a case involving the disclosure of customers' financial information to federal authorities, the Eleventh Circuit held that the bank was immune from suit and broadly interpreted the safe-harbor provision, stating:

> The plain language of this section supplies "an affirmative defense to claims against a financial institution for disclosing an individual's financial records or account-related activity." *Lopez*, 129 F.3d at 1191. Few courts have had the opportunity to examine this section in detail, but we recently explained in Lopez that § 5318(g)(3) grants to financial institutions "immunity from liability for three different types of disclosures: (i.) A disclosure of any possible violation of law or regulation, (ii.) A disclosure pursuant to § 5318(g) itself, or (iii.) A disclosure pursuant to any other authority." *Id.* These safe harbors are not limited to currency transactions, and any one of them provides a disclosing bank complete immunity. *See id.* at 1192.

*Coronado, supra.*

A similar case to the case before us is *Stoutt v. Banco Popular de Puerto Rico*, 320 F.3d 26 (1st Cir. 2003). In *Stoutt*, the Banco Popular de Puerto Rico ("Bank") filed a criminal referral form with the FBI stating the Bank's suspicion of Stoutt engaging in check kiting, knowingly writing a check against an account with insuffi-

cient funds. Stoutt was arrested on the charge, but the United States voluntarily dismissed the charges without prejudice. Stoutt then brought an action against the Bank, alleging malicious prosecution and other tort claims. The district court granted summary judgment in favor of the Bank, ruling that the Bank was entitled to absolute immunity under the safe-harbor provision of 31 U.S.C. § 5318(g)(3). On appeal, the First Circuit held that the Bank was entitled to immunity from the tort action of malicious prosecution under the safe-harbor provision of the Act. *Id.*

Based upon the clear authority of federal circuit courts' interpretations of the federal statute and my own reading of that statute, I believe the Bank in this case has complete immunity. Under the language of the Act, the bank had a duty to report "any possible violation of law or regulation." *Id.* Upon making the report as required by federal law, it is clear to me that the bank is protected against any action contending bad faith or malicious prosecution based upon further exploration of the suspicious activities.

Here, pursuant to the requirements of the Act, the Bank filed two SARs, naming appellee as a suspect. The first SAR was mailed by the Bank's attorney on September 17, 1997, after the meeting of the creditors was held in August of 1997. On the first SAR, the bank listed the suspicious activity as "consumer loan fraud" for the unauthorized sale of mortgaged equipment of a bulldozer, boat, and motor, which were held as collateral on a previous note and were no longer in appellee's possession. On May 4, 1998, a second SAR was faxed by the Bank, noting that appellee was "cutting and removal of timber of mortgage property without the bank's knowledge or consent."

On May 4, 1998, the same day that the second SAR was filed, a warrant was issued for appellee's arrest by the prosecuting attorney, alleging that appellee violated three counts of Ark. Code Ann. § 5-37-203, defrauding a secured creditor, a class D felony.[3]

---

[3] Ark. Code Ann. § 5-37-203, defrauding secured creditors, provides:

(a) A person commits the offense of defrauding secured creditors if he destroys, removes, cancels, encumbers, transfers, or otherwise disposes of property subject to a security interest with the purpose to hinder enforcement of that interest.

(b) Defrauding secured creditors is a Class D felony.

*Id.*

The first count includes selling collateral, which included a bull-dozer, boat, and motor. The second count includes selling timber on encumbered property when the mortgage specifically provided that appellee may not cut the timber. The third count was based upon the fact that appellee had received $160,721.71 from the sale of the timber, but had only paid $21,693.43 of those proceeds.

The Bank had a duty under the federal statute to report any suspicious activity that constituted "any possible violation of the law" under 31 U.S.C. § 5318(g)(3). It did so after the first meeting of creditors was held in the bankruptcy case on August 21, 1997. Based upon the broad interpretation of this federal statute under *Coronado, supra*, the Bank should receive immunity from prosecution.

The majority avoids any discussion of the question whether immunity is granted subject to the requirement of good faith. Rather, the majority addresses the Bank's alleged malicious actions under appellee's claim for malicious prosecution. Perhaps the majority does not address the issue of good faith as a requirement for immunity for two reasons. First, a good-faith requirement is not expressly stated in 31 U.S.C. § 5318, nor was it intended to be inferred. The Second Circuit notes in *Lee, supra*:

> [A]lthough the safe harbor provision is unambiguous, and does not require resort to legislative history, the history of the Act demonstrates that Congress did not intend to limit protection to statements made in good faith. *An earlier draft of the safe harbor provision included an explicit good faith requirement for statements made in an SAR. See* 137 Cong. Rec. S16,642 (1991). *However, the requirement was dropped in later versions of the bill, and was not included in the bill that was eventually enacted by Congress. See* 137 Cong. Rec. S17,910, S17,969 (1991); 31 U.S.C. § 5318(g)(3).

*Lee, supra* (emphasis added).

Second, under the plain meaning of the statute, the timing of the suspicious activity report does not show that the Bank acted in bad faith. Appellees suggest that the SARs were not filed until after appellants effectuated appellee's arrest in April 1998, but that assertion is false. The record shows that an SAR was mailed by the Bank's attorney on September 17, 1997 after the first meeting of creditors was held.

Based upon the authority of federal court interpretations of federal law and my own reading of those provisions, I would reverse the trial court's order denying appellants' motion for judgment notwithstanding the verdict.

## B. Alleged substantial evidence of malicious prosecution

After rejecting the applicability of the safe-harbor provisions of 31 U.S.C. § 5318, the majority affirms the trial court's denial of appellant's motion for judgment notwithstanding the verdict and holds that "the elements viewed in the light most favorable to the appellee reveals substantial evidence to support the jury's verdict." Even if the majority has authority to interpret the federal act contrary to the interpretation of federal courts, this case does not meet our own requirements for a charge of malicious prosecution.

The essential elements of malicious prosecution are: (1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages. *McLaughlin v. Cox*, 324 Ark. 361, 922 S.W.2d 327 (1996). Where the defendant makes a full, fair, and truthful disclosure of all the facts known to him before competent counsel and then acts *bona fide* upon such advice, this will be a complete defense to a claim of malicious prosecution. *Id.*; *see also Machen Ford-Lincoln-Mercury, Inc. v. Michaelis*, 284 Ark. 255, 681 S.W.2d 326 (1984).

In *Wal-Mart v. Binns*, 341 Ark. 157, 15 S.W.3d 320 (2000), the management at Wal-Mart suspected that Caroline Binns, an employee, was engaging in theft through falsification of computer cash-register entries. Management notified local law enforcement, and after an investigation and a probable-cause hearing, a warrant was issued for Binns's arrest. One year later, the prosecuting attorney *nolle prossed* the charges based upon insufficient evidence. Binns brought a claim against Wal-Mart for malicious prosecution, and a jury returned a verdict in Binns's favor. On appeal, we held that Wal-Mart was entitled to a directed verdict on the malicious prosecution claim because (1) there was not sufficient evidence for the jury to determine that Wal-Mart lacked probable cause and (2) there was an absence of malice. *Id.*

Likewise, in the present case, I see no showing that these five elements of malicious prosecution were satisfied. It is correct that a proceeding was instituted or continued by appellants against appellee when suspicious activity was suspected and a suspicious activity report was filed. The first element is satisfied if there is no federal immunity for the reporting.

The second element fails because there was no *termination of the proceedings* in favor of the plaintiff. The charges against appellee were dismissed before the case went to the jury because the statute of limitations had run. There was no determination that the prosecution would have failed if the statute of limitations had not run. Therefore, in my view, the second element is not satisfied.

With regard to the third element, I find nothing to suggest that there was an absence of probable cause for the proceeding. Here, a warrant was issued for appellee's arrest based upon a one and one-half page amended affidavit setting forth facts constituting reasonable cause. In the amended affidavit, I strongly believe that the facts alleged support reasonable cause to bring charges that appellee had committed three violations of Ark. Code Ann. § 5-37-203, defrauding a secured creditor, a class D felony. I am unable to comprehend the majority's conclusion that there was an absence of probable cause—not even a suspicious activity, according to the majority. Therefore, the third element is not satisfied.

Fourth, I do not believe that the prosecuting attorney's decision to prosecute the case rose to the level of malice. The United States Supreme Court has expressed its position on this question on several occasions. I believe the following statement in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), is sufficiently clear on this question:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as "the selection was (not) deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."

*Id.*

Ultimately, the criteria for a malicious prosecution must be based upon whether the prosecutor was malicious. We have said that malice has been defined as any improper or sinister motive for instituting the suit. *Cordes v. Outdoor Living Ctr., Inc.*, 301 Ark. 26, 781 S.W.2d 31 (1989). Malice need not spring from any spirit of malevolence nor be prompted by any malignant passion. *Foster v. Pitts*, 63 Ark. 387, 38 S.W. 1114 (1897). Malice may be inferred from lack of probable cause. *Cordes, supra.*

Here, the prosecutor stated that he never felt any pressure from the Bank to continue to prosecute this case. Rather, he chose to pursue prosecution based upon an affidavit of facts constituting reasonable cause, executed by Leighton Ballard, an investigator with the Carroll County Sheriff's Department. There, it is noted that appellee violated three counts of Ark. Code Ann. § 5-37-203, defrauding a secured creditor, a class D felony. Additionally, the trial court concluded that the prosecutor had probable cause to pursue the prosecution. For these reasons, I cannot agree that the prosecutor's actions rose to the level of malice under *Wal-Mart, supra.*

Fifth, no damages were assessed against appellee in the underlying claim by the Bank because the charges were ultimately dismissed. The fifth element is not satisfied, and I invite elaboration on this element by the majority.

Our standard of review on motions for judgment notwithstanding the verdict was enunciated in *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002), where we stated:

> [I]n reviewing the denial of a motion for judgment notwithstanding the verdict, we will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000); *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481. It is not the appellate court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In reviewing the sufficiency of the evidence as being substan-

tial on appellate review, we need only consider the testimony of the appellee and the evidence that is most favorable to the appellee. *Wal-Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 825 S.W.2d 810 (1992). Circumstantial evidence may meet the substantial-evidence test. *Id.*

*Lee, supra.*

Based upon this standard of review, as well as the foregoing principles of the supremacy of federal law and an analysis of the elements of malicious prosecution, I would hold that the trial court erred in allowing this case to be submitted to a jury.

Because I would dispose of the case on the first issue regarding the Bank's immunity, I would not reach the issue of damages. I respectfully dissent.