## BYME, INC. *v.* Jackie IVY and Connie Ivy

CA 05-28                                                   226 S.W.3d 15

### Court of Appeals of Arkansas
### Opinion delivered February 1, 2006

*Wright, Lindsey and Jennings, L.L.P.*, by: *J. Mark Davis* and *Troy A. Price*, for appellant.

*Friday, Eldredge and Clark, L.L.P.*, by: *Marvin L. Childers* and *Bruce B. Tidwell*, for appellees.

JOHN B. ROBBINS, Judge. This is a suit for damages and specific performance brought by appellees Jackie and Connie Ivy against appellant Byme, Inc., d/b/a RE/MAX (hereafter RE/MAX). RE/MAX has consistently defended against the Ivys' claims by asserting that a particular provision of the parties' contract, paragraph 6(f), relieved it from further performance. Prior to this appeal, the Ivys obtained a summary judgment on the ground that paragraph 6(f) was unenforceably vague. However, we reversed the summary judgment and remanded the case in *Byme, Inc. v. Ivy*, 84

Ark. App. 406, 141 S.W.3d 913 (2004) (*Byrne I*). Thereafter, a jury trial was held, and the Ivys were granted specific performance and awarded $158,847.71 in damages. RE/MAX now appeals and, still relying on paragraph 6(f), argues that the trial court erred in failing to grant its motion for a directed verdict and in instructing the jury. We agree that a directed verdict should have been granted, and we therefore reverse and remand.

In 1997, RE/MAX entered into an agreement with Jackie Ivy's employer, Huntco Steel, to provide relocation services to Huntco's employees in exchange for a fee paid by Huntco. As we explained in *Byrne I*, RE/MAX's services consist of obtaining an appraisal of the employee's home, sending the employee a contract of sale, along with various other documents, and offering to purchase the home for the appraised value. Once the employee executes the contract of sale and other documents, RE/MAX pays the employee his equity in the home; assumes the employee's mortgage or takes over payments on the employee's home loan; places the home into its "inventory"; and lists the home for sale. It then bills the employer for an initial fee of 7% of the home's appraised value, plus 4.5% of the appraised value for every quarter that the home remains in the inventory.

In July 2001, the Ivys were in the process of relocating when they received a letter from RE/MAX notifying them that Huntco had "contracted with us to provide you with our Home Purchase Program" and that, as soon as an appraisal could be obtained, the Ivys would "receive a verbal offer on your home and a formal written offer package will be sent to you."

On September 10, 2001, the Ivys received a document package from RE/MAX offering to purchase their property for its appraised value of $612,500. The package contained, *inter alia*, a warranty deed naming the Ivys as grantors but containing no grantee or amount of consideration; an owner's affidavit requiring information such as whether a divorce was pending, whether there were any leases on the premises, and whether there were any covenants or outstanding repair bills on the home; and an Irrevocable Limited Power of Attorney and Affidavit of Delivery and Acceptance of Warranty Deed, which acknowledged, among other things, that delivery of the deed to RE/MAX and its acceptance by RE/MAX "shall be sufficient delivery so as to operate as a valid conveyance of the property." The packet also contained a contract of sale naming RE/MAX as the buyer of the home. It provided that the Ivys would vacate the home by October

9, 2001; that within one year they would convey good and marketable title to RE/MAX or its nominee or a purchaser designated by RE/MAX; and that the Ivys' equity would be paid upon receipt of the properly executed documents. Paragraph 6(f) of the contract, which is central to this case, provided as follows:

> 6. EXPRESS CONDITIONS: As express conditions of this Contract, it is specifically understood and agreed that:
>
> . . . .
>
> f. RE/MAX is relying upon the Sellers' employer to make certain payments to it and, therefore, each and every obligation of RE/MAX under this contract is expressly contingent upon the Sellers' employer fulfilling all of its obligations to RE/MAX. Sellers agree that RE/MAX is released from any and all obligations of this Contract should the Sellers' employer fail to perform any of its duties with RE/MAX.

Following the Ivys' execution of the above documents, RE/MAX paid them their equity in the property. RE/MAX also sent a letter to Regions Bank, which had the mortgage on the home, stating that it was a "homebuying corporation under contract with various corporations to purchase their relocated employees' homes" and that it had "acquired" the Ivy property "for resale purposes only." The letter notified Regions that, until the home was sold, loan payments would be made by RE/MAX.

Once the Ivys' home was taken into the RE/MAX inventory, RE/MAX sent Huntco an initial invoice for $42,875 (7% of the home's appraised value), followed by another invoice for $27,562.50 (4.5% of the appraised value). When Huntco failed to pay the invoices and filed bankruptcy in February 2002, RE/MAX sent the Ivys a letter stating that Huntco was indebted to RE/MAX in the amount of $70,437.50 (the total of the two invoices) and that the Ivys' contract of sale was "expressly contingent upon your employer making certain payments to RE/MAX and fulfilling all of its obligations to RE/MAX." RE/MAX then demanded that the Ivys release RE/MAX from further liability under the contract of sale and reimburse RE/MAX for the equity payments RE/MAX had made to the Ivys, plus the mortgage payments RE/MAX had made to Regions and other expenses associated with the house. The Ivys were also advised that future mortgage payments and expenses would be their responsibility.

The Ivys resisted RE/MAX's demands and eventually sued RE/MAX on June 7, 2002, in Craighead County Circuit Court. They alleged that the sale of their home to RE/MAX "was complete"; that paragraph 6(f) was unduly vague and unenforceable; and that their execution and delivery of the warranty deed "completed the transaction and removed the 'condition' set forth in paragraph 6(f)." They sought an order requiring RE/MAX to continue making mortgage payments on the property and any other relief deemed appropriate. RE/MAX defended on the ground that paragraph 6(f) released it from its contractual obligations in light of Huntco's failure to pay. Although the trial court initially ruled that paragraph 6(f) was unenforceable, we reversed that ruling in *Byrne I*, and, upon our remand, RE/MAX re-asserted paragraph 6(f) as a defense during the jury trial.

The testimony of two witnesses was presented at the jury trial. Appellee Jackie Ivy testified that, based on the language in the documents that he signed, he did not believe that his contract with RE/MAX was merely a listing contract; rather, he thought that he was selling his home to RE/MAX. He said that he conveyed title to RE/MAX when he executed the power of attorney on September 12, 2001, and that he vacated the house by October 9, 2001, as required by the contract. Ivy also testified that he knew that there was a contract between RE/MAX and Huntco and that he fully understood paragraph 6(f) of his sales contract, but he thought that it applied only "up to the point of closing," *i.e.,* when he was paid his equity. He based this belief on paragraph 7(d) of the contract, which read: "The provisions of this Contract, unless fully performed, shall survive the execution and delivery of the deed and shall not be merged therein."

Ivy also stated that he had been through this type of relocation procedure several times before and that, on those occasions, "once the equity was disbursed, I never heard anything else." As a result, when he received his equity in the present case, he never checked to see whether the mortgage had been paid nor did he take the documents to an attorney for review because he had "never had any trouble" before. After receiving RE/MAX's letter demanding to be released from the contract, Ivy learned that the mortgage at Regions Bank had not been fully paid by RE/MAX, and he began making the mortgage, utility, and upkeep payments on the house in order to preserve his credit rating. Although he acknowledged that nothing in the sales contract required RE/MAX to pay off the Regions loan, he stated that

RE/MAX had offered to pay him $612,500 for the house and therefore should have paid that amount directly to him or should have paid off the Regions note after paying him his equity. He asked the jury to require RE/MAX to "remove the loan at Regions Bank in our name" and "reimburse us for the money we have been forced to spend for the last three years."

RE/MAX employee Paula Bogle testified that the documents in this case were prepared by RE/MAX or someone else at RE/MAX's direction. She characterized RE/MAX as "more of a property management company" trying to "transfer title to an outside buyer." She further stated that, upon Huntco's failure to pay the 7% and 4.5% invoices, RE/MAX was released from further obligations under the contract pursuant to paragraph 6(f). In response to Jackie Ivy's contention that paragraph 6(f) did not survive the "closing," *i.e.*, payment of equity to the Ivys, Bogle said that RE/MAX's obligations extended beyond the time when equity was paid. Additionally, she testified that RE/MAX never informed Regions that RE/MAX would assume complete liability for the home loan. However, she admitted that, with the deed and the power of attorney being executed by the Ivys, "nothing else was required from [the Ivys] to transfer" the house and that the Ivys "didn't have to do anything else to convey title." Finally, she said that the Ivys had fully performed the contract when they vacated the house on October 9, 2001, and she admitted that, in her pre-trial deposition, she stated that RE/MAX had fully performed by October 9.

At the close of all the evidence, RE/MAX moved for a directed verdict on the following basis:

> [T]he Arkansas Court of Appeals [in *Byrne I*] specifically determined that paragraph 6f was in the nature of a condition subsequent. Mr. Ivy testified that he understood that provision to refer to the contract between Huntco Steel and RE/MAX. The only fact remaining is whether or not Huntco fulfilled its obligations under that contract, and the testimony unrebutted here is that they did not. On top of that, there is absolutely no provision in the agreement that limits the time period of effectiveness of paragraph 6f of that contract to a closing date or any other time period and by virtue of those reasons, there, RE/MAX is released from all obligations under that contract.

The trial court denied the motion, ruling that the "contract taken as a whole submits issues for the jury." Following deliberations, the jury

determined that the Ivys were entitled to have RE/MAX "purchase their home" and reimburse them for $158,847.71 in mortgage payments and expenses. RE/MAX now appeals, arguing that the trial court erred in denying its motion for a directed verdict and erred in the manner in which it instructed the jury on RE/MAX's liability. The essence of both of these arguments is that paragraph 6(f) unequivocally relieved RE/MAX of further performance under its contract with the Ivys once Huntco failed to pay.

We first address RE/MAX's claim that the trial court erred in denying its motion for a directed verdict. A directed-verdict motion is a challenge to the sufficiency of the evidence. *King v. Powell*, 85 Ark. App. 212, 148 S.W.3d 792 (2004). When reviewing the denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.* A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Id.* Under those circumstances, a jury question is presented and a directed verdict is inappropriate. *Id.* It is not our province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury's verdict. *Id.*

RE/MAX's argument on this point is two-fold. First, it asserts that a directed verdict was required by virtue of the law-of-the-case doctrine. This assertion is based on our statements in *Byrne I* that paragraph 6(f) "clearly" released RE/MAX from its obligations should Huntco fail to perform and that the issue of whether or not Huntco failed to perform was a question of fact. In light of these holdings, RE/MAX contends, the trial court, on remand, should have considered "*only* the factual determination" of whether Huntco performed or failed to perform. Because Huntco undisputedly failed to perform, RE/MAX argues, it was relieved of its obligations and entitled to a directed verdict. In RE/MAX's second argument, it claims that, contrary to the Ivys' assertion, paragraph 6(f) survived the "closing" of the real-estate

sale. Because we agree with RE/MAX's second argument and with its first argument insofar as it advocates the clear meaning of paragraph 6(f), we conclude that a directed verdict should have been granted in RE/MAX's favor.[1]

The facts undisputedly show that the contractual arrangement crafted by RE/MAX required Huntco to essentially finance the relocation services by making payments to RE/MAX, which RE/MAX would then use to cover the mortgage payments and other expenses pending the sale of the home. In apparent recognition of this, RE/MAX included paragraph 6(f) in its contract with the Ivys, stating that its obligations to the Ivys were "expressly contingent" on Huntco's fulfilling its obligations and that "Sellers agree that RE/MAX is *released from any and all obligations of this Contract* should the Sellers' employer fail to perform any of its duties with RE/MAX." (Emphasis added.) As we recognized in *Byrne I*, paragraph 6(f) was a clear statement that RE/MAX would be released from its contractual obligations should Huntco fail to perform.

It is undisputed in this case that Huntco did not perform. It therefore follows that what *Byrne I* referred to as the "condition subsequent" in paragraph 6(f) was activated, and, at that point, RE/MAX's obligations to the Ivys' ceased.[2] The Ivys do not claim that paragraph 6(f) is ambiguous, and at trial they did not dispute its meaning or import. In fact, Jackie Ivy said that he read paragraph 6(f) and fully understood it. Under these circumstances, the issue of RE/MAX's liability should never have gone to the jury. When contractual language is unambiguous, its construction is a question of law for the court. *Carver v. Allstate Ins. Co.*, 77 Ark. App. 296, 76 S.W.3d 901 (2002). Further, when the language of a contract is clear, it must be given its plain and obvious meaning. *See id.* Under the clear language of paragraph 6(f) and Huntco's unquestioned failure to perform, RE/MAX was released from its obligations to the Ivys.

However, the Ivys have invoked a second provision of the sales contract, paragraph 7(d), in an effort to avoid the application of paragraph 6(f). Paragraph 7(d) provides that "the provisions of

---

[1] In light of our conclusion, we need not directly address RE/MAX's claim regarding the law-of-the-case doctrine.

[2] A condition subsequent is a condition that follows liability on a contract but provides for a contingency, which, if it occurs, will defeat a contract already in effect. *See Byrne I, supra.*

this Contract, unless fully performed, shall survive the execution and delivery of the deed. . . ." The Ivys contend that, under this provision, paragraph 6(f) did not survive the "closing," *i.e.*, the "full performance" of their real-estate sales contract with RE/MAX. They first point to evidence that their transaction with RE/MAX was in fact a real-estate sale. We agree that the documents that RE/MAX provided to the Ivys are replete with references to RE/MAX's "purchasing" the Ivys' home and that the transaction between RE/MAX and the Ivys bore many of the traditional indicators of a home sale, such as a contractual offer and acceptance, receipt of equity by the seller, warranties for the purpose of title insurance, and relinquishment of possession by the seller, among other things. However, even if the transaction was, in many respects, indicative of a home sale, that fact alone does not prevent the operation of paragraph 6(f). The condition subsequent in 6(f) exists whether the parties' transaction was a home sale, a listing agreement, or a hybrid of both.

The Ivys further argue that paragraph 6(f) was no longer in effect when Huntco defaulted in 2002 because, by that time, their contract with RE/MAX had been fully performed. As proof that full performance occurred prior to Huntco's default, they point to the fact that all of the documents necessary to transfer title to RE/MAX were executed in September 2001; that they vacated the home in October 2001; that they were paid their equity in November 2001; and that Jackie Ivy testified that his understanding of the contract was that, if Huntco did not meet its obligations "up to the point that we closed on the property," then RE/MAX was released from any further obligation "up until closing." They also note the testimony of RE/MAX's representative, Paula Bogle, who said in a deposition that RE/MAX had fully performed the contract on October 9, 2001, when the Ivys vacated the property. We disagree that these factors constitute substantial evidence that paragraph 6(f), at some point, lost its efficacy.

First, despite the fact that the Ivys executed the sales document, vacated the premises, received their equity in the property, and understood that the contract had been fully performed, the fact remained that RE/MAX had continuing obligations under the contract. For example, according to paragraph 6(c) of the contract, RE/MAX was required to "make payments [on the seller's mortgage] coming due after the date of assumption by RE/MAX or the Possession Date," which, in this case, was October 9, 2001. Moreover, the Ivys' contention that RE/MAX "fully performed"

the contract prior to Huntco's default is belied by the fact that they sued RE/MAX for specific performance of the contract — a contract that they now contend was fully executed and on which no further performance was required. Finally, Paula Bogle's deposition testimony that RE/MAX had fully performed by October 9, 2001, cannot be reconciled with the fact that RE/MAX sent the Ivys the balance of their equity payment and a revised settlement statement in November 2001. If Bogle's testimony was correct, then the Ivys would not have been entitled to the balance of their equity, which cannot be the case.

For the foregoing reasons, we believe that paragraph 6(f) clearly operated to relieve RE/MAX of its obligations under the contract once Huntco failed to perform and that the trial court should have granted a directed verdict in favor of RE/MAX. We therefore reverse and remand without addressing RE/MAX's arguments regarding jury instructions.

Reversed and remanded.

VAUGHT, CRABTREE, and ROAF, JJ., agree.

HART, J., concurs.

GLADWIN, GRIFFEN, GLOVER, and BAKER, JJ., dissent.

JOSEPHINE LINKER HART, Judge, concurring. I concur in the disposition of this case, but write separately because I believe that Jackie Ivy's employer, Huntco, should have been made a party, as required by Rule 19 of the Arkansas Rules of Civil Procedure. Rule 19 provides in pertinent part:

> (a) Persons to Be Joined if Feasible. A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or, (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter, impair or impede his ability to protect that interest, or, (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest. If he has not been joined, the court shall order that he be made a party.

I cannot ignore the fact that no matter whether we affirmed or reversed, the losing party was going to get less than they contracted for

because of Huntco's failure to perform. Accordingly, under the plain language of Rule 19, Huntco must be a necessary party. This is quintessentially the case of "the persons already parties [being] subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest." *Id.*

It is less clear to me, however, whether we are obligated to raise this issue on our own motion. My research has uncovered at least three cases, *Koonce v. Mitchell*, 341 Ark. 716, 19 S.W.3d 605 (2005), *Yamauchi v. Sovran Bank/Central South*, 309 Ark. 532, 832 S.W.2d 241 (1992), and *Harrison v. Knott*, 219 Ark. 565, 243 S.W.2d 642 (1951), where our supreme court did just that, and reversed and remanded the case with instructions to join the necessary party. However, I am also aware that the supreme court accepted certification of *McAdams v. McAdams*, 353 Ark. 494, 109 S.W.3d 649 (2003), for the purpose of conclusively stating whether an appellate court must *sua sponte* address whether all necessary parties have been joined in an action and subsequently decided that certification of this issue was improvidently granted. Given the unsettled nature of the law in this area, I am reluctant to seek a different disposition of this case, and therefore, I join the majority.

KAREN R. BAKER, Judge, dissenting. The majority places undue emphasis on the lack of ambiguity of paragraph 6(f), which is hardly in dispute; erroneously makes its own factual finding that the contract was not fully performed; and then compounds this error by not giving paragraph 7(d) of the contract due consideration. I believe that this case was properly submitted to the jury and that the jury's verdict was supported by substantial evidence. I therefore dissent.

Lying within the real-estate sales contract prepared by RE/MAX was a provision not ordinarily found in such documents. This provision, paragraph 6(f), can be likened to a time bomb that began "ticking" upon the parties' execution of the contract and would "blow up" the contract should a certain contingency occur, namely, Huntco's failure to pay. Although it is unnerving to contemplate being a party to such a contract with this type of clause, I make no comment on its propriety; the Ivys freely entered into this contract and admitted at trial that they were aware of the presence of paragraph 6(f). Moreover, I do not question the meaning of paragraph 6(f). I agree with our statement in *Byrne I* that the paragraph "clearly states that RE/MAX will be released

from its obligations under the contract of sale should the employer fail to perform its duties." *Byrne, Inc. v. Ivy*, 84 Ark. App. 406, 410, 141 S.W.3d at 915. However, the question in this case is not whether 6(f) is ambiguous; the question is, did it stop ticking before Huntco's default? To continue the metaphor, was it "disarmed" by the parties' completion of their contract? I believe that the answer to this question cannot be ascertained as a matter of law and was properly submitted to the jury.

As the trial judge correctly noted in denying RE/MAX's motion for a directed verdict, the "contract as a whole" must be considered in deciding this case. The contract contains not only paragraph 6(f) but paragraph 7(d), which provides that the provisions of the contract, "unless fully performed, shall survive the execution and delivery of the deed and shall not be merged therein." The Ivys contended at trial that, under this clause, paragraph 6(f) did not survive the closing of their real-estate sale. Thus, the fact-finder was presented with three issues to resolve: 1) the nature of the parties' contract; 2) whether the contract was fully performed by both parties; 3) whether paragraph 7(d) can be interpreted to mean that, upon completion of the parties' contract, paragraph 6(f) no longer applied. When the proof is viewed in a light most favorable to the Ivys, as our standard of review requires, there is substantial evidence to support a finding in their favor on each of these matters. *See, e.g., Dorton v. Francisco*, 309 Ark. 472, 833 S.W.2d 362 (1992).

First, the Ivys contend that the nature of their transaction with RE/MAX was a real-estate sale. Given the facts of this case, I hardly see how RE/MAX can claim otherwise. While the Ivys were in the process of relocating, they were solicited by RE/MAX and told that they would receive an offer on their home. Thereafter, they received a large packet of documents, all prepared by RE/MAX, in which RE/MAX unequivocally offered to purchase their home for $612,500. They went through all of the normal processes that accompany the selling of a home, such as executing a deed, warranting a lack of encumbrances, transferring possession to the purchaser, and receiving their equity. Further, they executed a power of attorney, which provided that delivery of the deed to RE/MAX operated as a valid conveyance of the property. Under these circumstances, it was perfectly reasonable for the Ivys to conclude that their contract with RE/MAX was a real-estate

sale. Moreover, a jury's determination that RE/MAX bought the house from the Ivys would be supported by substantial, even ample, evidence.

The next question is, when was the sale of the house completed? There is conflicting evidence on this point, but, again, our standard of review requires us to view the evidence in the light most favorable to the Ivys. When doing so, there is proof that, at the latest, the contract was complete when the Ivys received their final equity payment in November 2001. By that point, they had signed the offer and acceptance, transferred possession of the home to RE/MAX, conveyed the property to RE/MAX by virtue of the power-of-attorney, and received all monies that they were due from the sale. RE/MAX, by that point, had acquired possession of the home, had paid the Ivys their equity, and had begun making payments to the mortgagee, Regions Bank. Further, Paula Bogle testified that both parties had fully performed the contract on or about October 9, 2001, when possession was transferred. Any fact-finder with this proof before it would be perfectly justified in concluding that the parties' contract was fully executed by late 2001.[1]

Finally, we turn to what I perceive as the key issue in this case — did paragraph 6(f) survive the full performance of the parties' contract? An interpretation of paragraph 7(d) is crucial to this issue. It states that "the provisions of this Contract, unless fully performed, shall survive the execution and delivery of the deed and shall not be merged therein." The meaning of this clause is ambiguous. And, when the terms of a written contract are ambiguous, the meaning of the contract becomes a question of fact. *Carver v. Allstate Ins. Co.*, 77 Ark. App. 296, 76 S.W.3d 901 (2002).

Thus, it was the jury's job in this case to interpret paragraph 7(d). Certainly, a jury could reasonably construe the clause to say that, once the contract is "fully performed," its provisions do not survive. In other words, when the home sale was completed, the fully performed contract merged with the deed, and the contract, including paragraph 6(f), was no more. The logic of this interpre-

---

[1] I disagree with the majority's placing any significance on the Ivys' pursuing a claim for specific performance. They were simply seeking an order requiring RE/MAX to do what they thought RE/MAX had already done under the completed contract — make the mortgage payments to Regions Bank. I also note that the Ivys also asserted in their complaint that the sale of their home to RE/MAX was "complete."

tation is apparent when one considers what would have happened if Huntco, instead of defaulting just two months after the sale was complete, had defaulted two years later. Surely the parties' contract would not still be in the executory phase at that point, and surely paragraph 6(f) would not still be ticking, ready to "blow up" a home sale that had occurred two years previously.

This is a case replete with factual questions, and it was the jury's province to look at the contract as a whole and reach a resolution. I simply cannot agree with the majority that the jury's verdict was not supported by substantial evidence. I therefore dissent.

GLADWIN, GRIFFEN and GLOVER, JJ., join.