BYME, INC. *v.* Jackie IVY
and Connie M. Ivy

06-147                                    241 S.W.3d 229

Supreme Court of Arkansas
Opinion delivered October 12, 2006

[Rehearing denied November 16, 2006.*]

---

\* BROWN, IMBER, and DICKEY, JJ., would grant rehearing.

*Wright, Lindsey & Jennings, LLP*, by: *J. Mark Davis, Troy A. Price*, and *Colin R. Jorgensen*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *Marvin L. Childers* and *Bruce Tidwell*, for appellees.

JIM GUNTER, Justice. Appellees Jackie and Connie Ivy brought this contract action for specific performance and damages against appellant Byme, Inc., operating under the name of RE/MAX International Relocation Services, Inc. ("RE/MAX"), for breach of a contract to purchase property from the Ivys. The jury returned a verdict in favor of the Ivys on their claim for specific performance and awarded damages in the amount of $158,847.71. RE/MAX appeals, arguing that the circuit court erred in refusing to grant its motion for directed verdict and in giving instructions to the jury. We affirm.

In 1997, RE/MAX entered into an agreement with Jackie Ivy's employer, Huntco Steel, to provide relocation services to Huntco's employees in exchange for a fee paid by Huntco.

RE/MAX's services consisted of obtaining an appraisal of the employee's home, sending the employee a contract of sale, along with various other documents, and offering to purchase the home for the appraised value. Once the employee executed the contract of sale and other documents, RE/MAX would pay the employee his equity in the home, assume the employee's mortgage, and list the home for sale. For these services, Huntco agreed to pay RE/MAX an initial fee of 7% of the home's appraised value, plus 4.5% of the appraised value for every quarter that the home remained in RE/MAX's inventory.

In July 2001, the Ivys were in the process of relocating when they received a letter from RE/MAX notifying them that Huntco had "contracted with us to provide you with our Home Purchase Program" and that, as soon as an appraisal could be obtained, the Ivys would "receive a verbal offer on your home and a formal written offer package will be sent to you." On September 10, 2001, the Ivys received a document package from RE/MAX offering to purchase their property for its appraised value of $612,500. The package contained a warranty deed naming the Ivys as grantors, but it failed to identify a grantee or amount of consideration. It also contained an owner's affidavit and an Irrevocable Limited Power of Attorney and Affidavit of Delivery and Acceptance of Warranty Deed, which acknowledged the following: the "Warranty Deed is and has been irrevocably delivered to the control of RE/MAX without recourse"; RE/MAX "shall have the absolute authority and power to enter, or cause to be entered, the date, financing terms and the name of "Grantee" into the said Deed"; and "the delivery of the deed to RE/MAX and acceptance thereof by RE/MAX shall be sufficient delivery so as to operate as a valid conveyance of the property." The packet also contained a Contract of Sale naming RE/MAX as the buyer of the home.

The Ivys signed the Contract of Sale and related documents necessary to transfer title to the property and returned them to RE/MAX on September 13, 2001. In accordance with the Contract of Sale, the Ivys moved out of the house on October 9, 2001. RE/MAX paid the Ivys the agreed upon equity in two payments, the last of which was wired to the Ivys in early November of 2001.

RE/MAX sent a letter to Regions Bank, the mortgage lender on the home, identifying the Ivys home by loan number and address and explaining to Regions that RE/MAX was "a homebuying corporation" and that it had "acquired this property for resale purposes only."

The letter informed Regions that, until the home was resold, "all payments will be made by RE/MAX International Relocation Services, Inc., as owners under contract."

Huntco failed to pay the invoices sent by RE/MAX and, in February 2002, filed for bankruptcy. By letter to the Ivys dated February 12, 2002, RE/MAX explained that Huntco had failed to pay RE/MAX; that RE/MAX was thereby released under the Contract of Sale; and that it would not make any additional mortgage payments or any other maintenance payments on the home. RE/MAX also demanded reimbursement from the Ivys for payments made in the amount of $55,858.81.

The Ivys filed this lawsuit against RE/MAX on June 7, 2002, in Craighead County Circuit Court, alleging that the sale of their home to RE/MAX "was complete." They demanded specific performance of the contract. In response to RE/MAX's argument that it was released from any and all obligations under the contract because of section 6(f) of the contract, the Ivys filed a motion for summary judgment, arguing that section 6(f) of the contract was unenforceably vague.[1] The trial court granted the Ivys' motion and ordered RE/MAX to specifically perform the contract of sale and to pay damages to the Ivys to compensate them for amounts they had spent on the property since February 2002. The court of appeals reversed the order of summary judgment, holding that section 6(f) was not unenforceably vague. *See Byrne, Inc. v. Ivy*, 84 Ark. App. 406, 141 S.W.3d 913 (2004) (*"Byrne I"*).

On remand, the circuit court held a jury trial. At the close of the evidence, RE/MAX moved for a directed verdict, arguing that, in *Byrne I*, the court of appeals determined that section 6(f) was a condition subsequent; that Mr. Ivy testified he understood this section of the contract; that it was undisputed Huntco had not fulfilled its obligations to RE/MAX; that there was no provision in the contract limiting the period of effectiveness of section 6(f); and therefore that RE/MAX was released from all obligations under

---

[1] Section 6(f) is an express condition of the Contract of Sale which states:

RE/MAX is relying upon the Sellers' employer to make certain payments to it and, therefore, each and every obligation of RE/MAX under this contract is expressly contingent upon the Sellers' employer fulfilling all of its obligations to RE/MAX. Sellers agree that RE/MAX is released from any and all obligations of the Contract should the Sellers' employer fail to perform any of its duties with RE/MAX.

the contract. The circuit court denied the motion, ruling that "the contract taken as a whole submits issues for the jury in connection with this case." The jury returned a verdict for the Ivys, finding that RE/MAX breached the contract and awarding damages in the amount of $158,847.71 to compensate the Ivys for expenses paid on the house. RE/MAX filed an appeal with the Arkansas Court of Appeals.

The court of appeals reversed, holding that section 6(f) of the Contract of Sale released RE/MAX from its obligations under the contract once Huntco failed to perform, and consequently, that the circuit court should have directed a verdict in favor of RE/MAX. *See Byrne, Inc. v. Ivy*, 94 Ark. App. 88, 226 S.W.3d 15 (2006) ("*Byrne II*"). The Ivys filed a petition for review of the court of appeals' decision. We granted the Ivys' petition pursuant to Ark. Sup. Ct. R. 2-4 (2006). When this court grants a petition for review of a decision of the court of appeals, it reviews the case as though it had originally been filed in the Arkansas Supreme Court. Ark. Sup. Ct. R. 1-2(e). *Deaver v. Faucon Properties, Inc.*, 367 Ark. 288, 239 S.W.3d 525 (2006).

RE/MAX brings two points on appeal: first, the circuit court erred in denying its motion for directed verdict and, second, the circuit court erred in its instructions to the jury regarding section 6(f). Essential to both of these arguments is RE/MAX's contention that section 6(f) unequivocally released RE/MAX from further performance under its contract with the Ivys once Huntco failed to perform its payment obligations to RE/MAX. Section 6(f) of the Contract of Sale states as follows:

> 6. EXPRESS CONDITIONS: As express conditions of the Contract, it is specifically understood and agreed that
>
> . . .
>
> f. RE/MAX is relying upon the Sellers' employer to make certain payments to it and, therefore, each and every obligation of RE/MAX under this contract is expressly contingent upon the Sellers' employer fulfilling all of its obligations to RE/MAX. Sellers agree that RE/MAX is released from any and all obligations of the Contract should the Sellers' employer fail to perform any of its duties with RE/MAX.

First, we address RE/MAX's argument that the circuit court erred in denying its motion for directed verdict. A directed verdict motion is a challenge to the sufficiency of the evidence, and when

reviewing the denial of a motion for directed verdict, we determine whether the jury's verdict was supported by substantial evidence. *The Bank of Eureka Springs v. Evans*, 353 Ark. 438, 453, 109 S.W.3d 672, 681 (2003). We have defined substantial evidence as follows:

> Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty and it must force the mind to pass beyond mere suspicion or conjecture. *State Auto Property Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999); *Barnes, Quinn, Flake & Anderson, Inc. v. Rankins*, 312 Ark. 240, 848 S.W.2d 924 (1993). When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered, and we give that evidence the highest probative value. *Id.* A motion for directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000). A motion for directed verdict should be denied when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach different conclusions. *Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991).

*D'Arbonne Constr. Co., Inc. v. Foster*, 354 Ark. 304, 307-08, 123 S.W.3d 894, 897-98 (2003).

RE/MAX contends that the court of appeals' construction of section 6(f) as a condition subsequent in *Byme I* was binding upon the circuit court as law of the case and required it to direct a verdict in favor of RE/MAX. Specifically, RE/MAX claims that the court of appeals in *Byme I* remanded the case solely for the circuit court to determine whether the condition subsequent occurred. If it did, RE/MAX maintains, the circuit court was required to direct a verdict. RE/MAX contends that the evidence is undisputed that Huntco failed to meet its payment obligations to RE/MAX. Therefore, RE/MAX argues, under 6(f), it was released from the Contract of Sale with the Ivys. RE/MAX claims that it is irrelevant whether the contract was for the purchase of the Ivys' home or the listing of their home. In either case, it claims the contract was cancelled if Huntco failed to perform its agreement with RE/MAX.

The Ivys respond, arguing that the law–of–the–case doctrine does not decide this case. First, they claim that law of the case does not apply when the facts were not fully developed before the first appeal and are materially changed after the trial on remand. *See Wilson v. Wilson*, 301 Ark. 80, 82, 781 S.W.2d 487, 488 (1989); *Linograph Co. v. Bost*, 180 Ark. 1116, 1120, 24 S.W.2d 321, 323 (1930). Second, they argue that section 6(f) is not the only contractual provision requiring interpretation. They contend that the ambiguous contractual relationship was required to be submitted to the jury in its entirety. They argue that determining whether a breach occurred required consideration of sections 6(f) and 7(d) of the Contract of Sale in addition to the remaining contractual documents and the construction the parties gave to the contractual documents, evidenced by their statements, acts, and conduct. *See Sturgis v. Skokos*, 335 Ark. 41, 53, 977 S.W.2d 217, 223 (1998). Finally, they conclude that under our standard of review, there is substantial evidence to support the jury's verdict.

The doctrine of the law of the case prohibits a court from reconsidering issues of law and fact that have already been decided in a prior appeal. *Jones v. Double "D" Properties, Inc.*, 357 Ark. 148, 161 S.W.3d 839 (2004). However, the court is not bound by obiter dictum, "even if couched in terms that infer the court reached a conclusion on the matter." *Clemmons v. Office of Child Support Enforcement*, 345 Ark. 330, 347, 47 S.W.3d 227, 239 (2001). When discussion or comment is not necessary to the decision reached therein, the discussion or comment is an obiter dictum. *Id.* Furthermore, the law–of–the–case doctrine is not applicable if "there is a material change in the facts." *Wilson v. Wilson*, 301 Ark. 80, 82, 781 S.W.2d 487, 488 (1989); *see also Linograph Co.*, 180 Ark. at 1120, 24 S.W.2d at 323 (holding that law of the case does not apply where the facts have not been fully developed and there are other issues that have not been determined either by the trial or appellate court).

In order to determine what is the law of the case in this action, we must first determine what the court of appeals held in *Byme I*. The appeal in *Byme I* was from the circuit court's order granting the Ivys' motion for summary judgment, holding that section 6(f) was unenforceably vague and, therefore, that RE/MAX was not released from its duties under the Contract of Sale. The court of appeals framed the issue before it in *Byme I* as: "whether paragraph 6(f) of the contract is so vague as to be unenforceable." *Id.* at 410, 141 S.W.3d at 915. The court of

appeals then held that it "d[id] not believe paragraph 6(f) is incapable of being understood," *id.*, and summary judgment was not appropriate. The court went on to describe its understanding of section 6(f) as being "in the nature of a condition subsequent." *Id.* at 411, 141 S.W.3d at 916.

The law of the case in *Byrne I* is that section 6(f) is not unenforceably vague. That was the issue before the court, and that was the issue the court of appeals decided. However, even assuming that the court of appeals' statement that section 6(f) is in the nature of a condition subsequent is law of the case does not resolve the parties' dispute in the present appeal. To determine whether the Ivys were entitled to specific performance of the contract required the circuit court to do more than simply determine whether Huntco failed to fulfill its obligations to RE/MAX. The question in the circuit court was whether RE/MAX was required to perform its obligations under the contract. That is, did the parties enter into a contract for sale, pursuant to which RE/MAX purchased the Ivys' property, or an agency agreement, pursuant to which RE/MAX merely agreed to list the Ivys' property for sale? And, in either case, was there any limit on section 6(f) or did the parties intend for RE/MAX to be released at *any* point in the future should Huntco fail to pay?

In order to make this determination, one must look at the entire contract. Section 7(d) states: "The provisions of this Contract, unless fully performed, shall survive the execution and delivery of the deed and shall not be merged therein."[2] While section 6(d) may not be vague or unclear standing alone, it was not error for the circuit court to conclude that it is ambiguous when construed with section 7(d). We stated in *First Nat'l Bank of Crossett*, 310 Ark. 164, 832 S.W.2d 816 (1992), that it is

> a settled rule in the construction of contracts that the interpretation must be upon the entire instrument, and not merely on disjointed or particular parts of it. The whole context is to be considered in ascertaining the intention of the parties, even though the immediate object of inquiry is the meaning of an isolated clause. Every word

---

[2] Presumably this section refers to the general principle of law that an agreement for the sale of land made prior to or simultaneous with a deed merges into the deed and is of no effect. *See Surf Club, Inc. v. Lubin*, 282 Ark. 150, 666 S.W.2d 405 (1984); *Barnes v. Barnes*, 275 Ark. 117, 627 S.W.2d 552 (1982). In this case, the Ivys executed the deed and power of attorney before they were scheduled to vacate their home.

in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument. The contract must be viewed from the beginning to end, and all its terms must pass in review, for one clause may modify, limit or illuminate the other.

*Id.* at 170, 832 S.W.2d at 819.

With regard to interpreting potentially conflicting clauses in a contract, we have stated that, if possible, the clauses should be reconciled:

In seeking to harmonize different clauses of a contract, we should not give effect to one to the exclusion of another even though they seem conflicting or contradictory, nor adopt an interpretation which neutralizes a provision if the various clauses can be reconciled. The object is to ascertain the intention of the parties, not from particular words or phrases, but from the entire context of the agreement.

*Sturgis,* 335 Ark. at 53, 977 S.W.2d at 223 (quoting *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.,* 289 Ark. 550, 556, 713 S.W.2d 462, 465 (1986)). Furthermore, if there is an ambiguity in a contract, a court will accord considerable weight to the construction the parties themselves give to it, evidenced by subsequent statements, acts, and conduct. *Id.* Finally, ambiguities in a written contract are construed strictly against the drafter. *Universal Security Ins. Co. v. Ring,* 298 Ark. 582, 586, 769 S.W.2d 750, 752 (1989).

In order to determine whether the jury's verdict was supported by substantial evidence, we turn to the evidence presented to the jury in this case. The testimony of two witnesses was presented at trial. Mr. Ivy testified that he thought he was selling his home to RE/MAX. He believed that he conveyed title to RE/MAX when he executed the deed and the power of attorney on September 12, 2001, and then vacated the house on October 9, 2001, as required by the contract. While he acknowledged his understanding of section 6(f) of the contract, he thought it applied only up to the point of closing, that is, when he was paid his equity. He based this belief on the language in section 7(d) stating that the provisions of the contract survived execution and delivery of the deed "unless fully performed."

RE/MAX employee Paula Bogle testified that the documents were prepared by RE/MAX or at RE/MAX's direction.

She admitted that after execution of the deed and the power of attorney by the Ivys, nothing else was required from the Ivys for RE/MAX to convey title to a third party. She also admitted that the Ivys had fully performed the contract when they vacated the house on October 9, 2001.

The jury was presented with a number of documents that reflected the parties' agreement. "[W]hen two instruments are executed contemporaneously by the same parties in the course of the same transaction, the instruments should be considered as one contract for the purposes of interpretation." *Universal Security Ins. Co.*, 298 Ark. at 586–87, 769 S.W.2d at 753. First, the cover letter transmitting the documents to the Ivys stated that RE/MAX was "offering to purchase your property."

Next, the Contract of Sale included the following provisions: "RE/MAX agrees to purchase and Sellers agree to sell and convey to RE/MAX or its nominee for the Appraised Value of $612,500.00" the Ivys' home; "Sellers agree to vacate and deliver possession of the Home on or before October 9, 2001"; "The Sellers' equity shall be paid based on your company's relocation policy after receipt by RE/MAX of a copy of the Offer Letter, all legal documents provided by RE/MAX and properly executed by Sellers and this Contract properly executed by Sellers and upon receipt by RE/MAX of all information relating to taxes, encumbrances, mortgages, and other relevant information, all of which information RE/MAX shall promptly confirm"; "5. CONVEYANCE AND CONDITION OF TITLE: a. Within one year from the date hereof and upon the written request of RE/MAX, the Sellers agree to convey to RE/MAX or its nominee, or to a purchaser to be designated by RE/MAX, good and marketable title . . . by a good and sufficient deed with general warranties of title in form acceptable to counsel for RE/MAX or its nominee"; and "6. EXPRESS CONDITIONS: As express conditions of this Contract, it is specifically understood and agreed that . . . c. RE/MAX or its nominee may assume any existing mortgages encumbering the Home to the extent permitted by the terms of any document creating such mortgage . . . ; provided, however, that if the Sellers can demonstrate that an existing FHA or VA loan must be satisfied in order for them to obtain similar financing on another residence, RE/MAX shall satisfy such loan within forty-five (45) days after receipt of the Sellers' written request."

Further, the Irrevocable Limited Power of Attorney and Affidavit of Delivery and Acceptance of Warranty Deed states:

"Warranty Deed is and has been irrevocably delivered to the control of RE/MAX without recourse;" RE/MAX "shall have the absolute authority and power to enter, or cause to be entered, the date, financing terms and the name of "Grantee" into the said Deed;" and "the delivery of the deed to RE/MAX and acceptance thereof by RE/MAX shall be sufficient delivery so as to operate as a valid conveyance of the property."

The Owner's Affidavit executed by the Ivys stated: "This Affidavit has been made for the purpose of inducing RE/MAX International Relocation Services, Inc., a Colorado Corporation, through its Relocation Service, to purchase the premises owned by me . . . ." Finally, the letter RE/MAX sent to the Ivys' mortgage lender stated that RE/MAX was "a homebuying corporation" and that it had "acquired this property for resale purposes only." The letter informed Regions that, until the home was resold, "all payments will be made by RE/MAX International Relocation Services, Inc., as owners under contract."

When the Ivys vacated the home, RE/MAX took possession under the contract. RE/MAX took over all payments on the home, including the mortgage, and listed the property for sale. Viewing the evidence and all reasonable inferences arising therefrom in the light most favorable to the Ivys, we hold that fair-minded people might conclude that the parties had entered into a contract under which RE/MAX purchased the Ivys' home.[3] Thus, we conclude that there is substantial evidence from which a jury could determine the agreement between the Ivys and RE/MAX was not an agency agreement under which RE/MAX simply agreed to list the Ivys' property, but an agreement by RE/MAX to purchase the property.

We turn now to the question of whether there was evidence to support the jury's verdict that section 6(f) did not release RE/MAX from its agreement. The language in section 7(d) states, "[t]he provisions of this Contract, *unless fully performed*, shall survive the execution and delivery of the deed and shall not be

---

[3] *See Hixon v. Sch. Dist. of Marion*, 187 Ark. 554, 60 S.W.2d 1027 (1933) (court listed essential attributes of ownership of property as the rights of dominion, possession, enjoyment, and disposition). Whether or not RE/MAX exercised all of its ownership rights, after transfer of possession and execution of the contract documents, these attributes rested in RE/MAX, not the Ivys.

merged therein." Thus, in order to harmonize this provision with section 6(f), the jury was faced with determining whether the contract was "fully performed."

Both Mr. Ivy and Ms. Bogle testified that all of the documents necessary to transfer title to the property had been delivered to RE/MAX. At this point, the Ivys had no control over the property and no ability to sell it. While the reason RE/MAX purchased the property without putting its name on the deed and recording it was in order to resell it to a third party, this did not change the fact that RE/MAX could have inserted its name at any point and recorded the deed. In light of the fully executed irrevocable power of attorney, the Ivys had no control over who was named as grantee or when. Furthermore, the Ivys were not entitled to receive anything further from the sale of their home. The price for which RE/MAX *resold* the property was irrelevant to the Ivys.

In addition, while it is true that RE/MAX must continue to pay the mortgage for as long as it owns the property, this does not necessarily indicate that the contract was not "fully performed" within the meaning of section 7(d). Had Huntco not filed for bankruptcy and continued to make payments to RE/MAX, RE/MAX could have chosen to make mortgage payments and bill Huntco for the life of the mortgage. Huntco could have failed to perform ten years after the Ivys moved out rather than several months. Indeed, pursuant to the contract, RE/MAX was required to satisfy the loan if the Ivys proved it was a VA or FHA loan that must be satisfied in order for the Ivys to obtain similar financing on another residence. Viewing the documentary and testimonial evidence in the light most favorable to the Ivys, we find that there was substantial evidence to support the jury's verdict that the parties had fully performed the agreement. Therefore, we hold that it was not error for the circuit court to deny RE/MAX's motion for directed verdict.

RE/MAX's second point on appeal is that the circuit court erred in refusing to give the following jury instruction proffered by RE/MAX:

> As a defense to the Ivys' claim of breach of the Contract of Sale, [RE/MAX] asserts that a condition subsequent under the Contract of Sale occurred, and the occurrence of the condition excuses [RE/MAX] from all performance of its obligations under the

Contract of Sale. A condition subsequent is an occurrence or future event that defeats a contract already in effect if it occurs after the parties enter the contract.

Paragraph 6(f) of the Contract of Sale is a condition subsequent. The Ivys agreed to release [RE/MAX] from all obligations under the Contract of Sale if Mr. Ivy's employer, Huntco Steel, Inc., failed to perform its obligations under the Agreement for Relocation Services between [RE/MAX] and Huntco Steel, Inc.

In order for [RE/MAX] to prevail on this defense, you must determine whether Huntco Steel, Inc. failed to perform its obligations to [RE/MAX] under the Agreement for Relocation Services.

Source: *Byme, Inc. v. Jackie Ivy and Connie Ivy*, Arkansas Court of Appeals, Case No. CA03-716, pp. 5-6 (January 21, 2004).

A party is entitled to a jury instruction when it is a correct statement of the law, and there is some basis in the evidence to support giving the instruction. *Southern Farm Bureau Cas. Ins. v. Daggett*, 354 Ark. 112, 129, 118 S.W.3d 525, 535 (2003). We will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.*

The court denied RE/MAX's request to give this instruction to the jury, ruling that it did not accurately embody the holding of *Byme I.* The circuit court stated that the language in the proffered instruction amounted to an unnecessary comment on the evidence and told the jury what to do rather than allowing the jury to decide what is correct. With regard to the reference to *Byme I* in the proffered instruction, the circuit court stated that it was "none of this jury's business as to what happened in the Court of Appeals."

The Ivys respond to RE/MAX's argument, claiming that this jury-instruction argument merely reiterates RE/MAX's law-of-the-case argument above. The Ivys claim that this instruction suggests that the only issue for the jury to decide is whether Huntco made payments to RE/MAX. They argue that it ignores other issues the jury should consider in connection with section 6(f), including the other provisions in the contract, the intent of the parties, the parties' course of performance, and whether the condition was extinguished by "full performance."

The following instruction was provided by the Ivys and used by the circuit court:

You must determine whether Jackie and Connie Ivy agreed with [RE/MAX] that [RE/MAX] would not be obligated to purchase their home if Mr. Ivy's employer failed to make certain payments to [RE/MAX] after the Ivys gave possession of their home to [RE/MAX]. If you decide that Jackie and Connie Ivy did so agree, you must then decide whether Mr. Ivy's employer failed to make the certain payments.

As a defense to its nonperformance of the contract, [RE/MAX] asserts that a condition subsequent occurred, which excused performance. A condition subsequent is a condition or future event specified in a contract that defeats a contract already in effect if it occurs after the parties enter into the contract.

For [RE/MAX] to prevail under this defense, you must determine whether the parties agreed that defendant would not be bound to fulfill the contract if Mr. Ivy's employer failed to make certain payments to [RE/MAX] after the Ivys gave possession of the home to [RE/MAX]. If you decide that Jackie and Connie Ivy and [RE/MAX] did so agree, you must then decide whether Mr. Ivy's employer failed to make certain payments.

Once again, RE/MAX argues that the law of the case forbade the circuit court from allowing the jury to consider whether section 6(f) released RE/MAX from the contract at any time if Huntco refused payment. RE/MAX claims that the law of the case clearly states that if the jury determined that Huntco defaulted in its agreement with RE/MAX, RE/MAX's duties under the contract with the Ivys were terminated pursuant to section 6(f).

We disagree with RE/MAX's law-of-the-case argument for the reasons stated in our discussion of the motion for directed verdict above. The jury was required to consider the contract as a whole. Whether Huntco failed to make certain payments to RE/MAX triggering section 6(f) was merely one part of the jury's analysis. The court of appeals did not hold that section 6(f) controlled the entire contract. The court of appeals merely resolved the issue before it, and held that section 6(f) was not "incapable of being understood." *Byme I*, 84 Ark. App. at 410, 141 S.W.3d at 915. The jury also had to determine whether delivery of possession by the Ivys constituted full performance, thereby merging the Contract of Sale into the deed and extinguishing the

provisions in the contract, including section 6(f). We hold that the circuit court did not abuse its discretion in rejecting RE/MAX's proffered instruction and in giving the jury instructions provided by the Ivys.

Affirmed.

BROWN, IMBER and DICKEY, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. One of the basic precepts of contract interpretation is that the different clauses of a contract must be read together so that all of its parts harmonize, and one provision should not be given effect to the exclusion of another, nor an interpretation be adopted which neutralizes a provision if the various provisions can be reconciled. *Sturgis v. Skokos*, 335 Ark. 41, 977 S.W.2d 217 (1998). Although the majority opinion initially recites the above-stated maxim, the majority nonetheless goes on to interpret the contract at issue here in a manner that is in complete contravention of that basic precept in contract law. By interpreting the contract as being fully performed at the alleged "closing" of the deal — when the Ivys completed and returned the required documents to RE/MAX, were paid their equity, and vacated the home — the majority renders paragraph 6(f) of the contract superfluous and ignores the obvious purpose of paragraph 7(d). Only when paragraphs 6(f) and 7(d) are interpreted together so that the condition in paragraph 6(f) survives the alleged "closing" of the real estate deal, can both provisions function harmoniously. Therefore, because the initial determination of the existence of ambiguity in a contract is a question of law for the circuit court, I conclude that the circuit court erred when it failed to grant RE/MAX's directed-verdict motion and, instead, submitted the issue of the contract's interpretation to the jury. *See Fryer v. Boyett*, 64 Ark. App. 7, 978 S.W.2d 304 (1998). Accordingly, I must respectfully dissent.

First, if, as the majority proposes, the contract was fully performed as of the date of "closing," paragraph 6(f) would never take effect in the instant case, and thus it would be meaningless. The function of paragraph 6(f) was to relieve RE/MAX of all of its obligations under the RE/MAX-Ivy contract if Huntco failed to perform its duties under the RE/MAX-Huntco contract. However, under the RE/MAX-Huntco contract, Huntco was not obligated to begin paying RE/MAX service fees on an employee's house until RE/MAX took the house into its inventory. A house

would become part of RE/MAX's inventory when RE/MAX had acquired it under a "Contract of Sale," but the house had not yet been conveyed to a third party. That is, in order for a home to be in RE/MAX's inventory the following had to occur: (1) the employee had to accept RE/MAX's offer by completing and returning all of the requisite legal documents, including the Contract of Sale and the Warranty Deed, (2) RE/MAX had to pay the employee his or her equity within four days of its receipt of the documents, and (3) RE/MAX had to take possession of the home. Then, at the end of the month in which a house was taken into inventory, Huntco's obligations to RE/MAX would finally be triggered when RE/MAX sent Huntco an initial invoice on the house.

In the instant case, the home was taken into RE/MAX's inventory on October 9, 2001 — the date by which the Ivys had returned the requisite documents to RE/MAX, RE/MAX had paid the Ivys their equity, and the Ivys had vacated their home. Consequently, the earliest date that Huntco would have been obligated to pay RE/MAX service fees for the Ivys' house was October 31, 2001, the end of the month in which the house was taken into RE/MAX's inventory. According to the majority, paragraph 6(f) merged into the deed on October 9 and became unenforceable. Such an interpretation dictates an absurd result by nullifying other provisions in the contract. Under the majority's interpretation, paragraph 6(f) was never enforceable because Huntco's obligations never came to fruition before the "closing" date. A further result would be that RE/MAX would have no recourse if Huntco breached its obligations, and thus paragraph 6(f) would be utterly meaningless.

The majority's interpretation also ignores the clear purpose of paragraph 7(d). I agree with the majority that the parties probably included paragraph 7(d) in an attempt to prevent their duties under the contract from merging into the deed when it was transferred to RE/MAX. However, by interpreting the contract as being fully performed at the "closing" when the Ivys had completed all of their duties to RE/MAX, the majority ignores the fact that RE/MAX, the other party to the contract, had not performed all of its duties to the Ivys at that time.

The Contract for Sale lists the purchase price of the Ivys' home as $612,500, but the Ivys only received $24,066.11 in equity from RE/MAX. Additionally, the contract states that if RE/MAX assumed the Ivys' mortgage it would make all payments on the

mortgage after the date of possession and could continue making payments until a third-party buyer was found. At the point when the majority views the contract as being fully performed, October 9, RE/MAX had completed virtually none of its duties under the contract. Although RE/MAX had paid the Ivys their equity in the house, it had not made a single mortgage payment nor had it located a third-party buyer. As stated above, paragraph 7(d) was included to protect the parties from a breach of the contract after the deed was transferred, but the majority's interpretation of the contract eviscerates any protection the Ivys had from a breach by RE/MAX. If, as the majority contends, the contract merged into the deed on the date of "closing," RE/MAX would have been relieved of any obligation to continue paying the Ivys' mortgage and could have allowed the mortgage to go into default. Basically, RE/MAX could have acquired a home worth $612,500 for a bargain price of $24,066.11.

Finally, I would point out that the Ivys' assertion — that the contract was fully performed — completely contradicts their request for specific performance because specific performance is a remedy that is only appropriate when one party to a contract has not yet fully performed. If the contract here was fully performed at "closing" and if, as the majority asserts, RE/MAX was only obligated to make mortgage payments because it was the owner of the home, then how can the majority justify the jury's decision to require RE/MAX to specifically perform by making mortgage payments for the Ivys' benefit?

For the above stated reasons, I respectfully dissent.

BROWN and DICKEY, JJ., join this dissent.